15-5988-9990-9911-4003-4028 United States of America v. Kenneth Flowers et al. Terrence Chappell Kelly Alexander Jeanne Nichols Justin Maxwell Arkansas v. Keith Thurman Good morning. I'm Joan Pettinelli representing Justin Maxwell. I intend to address in this argument the trial errors here that deprived my client of a fair trial in this case. I am resting on the briefs as it relates to the outrageous government conduct. We have also divided our arguments and I will join in my colleague Ms. Curtis' arguments regarding sentence manipulation. Justin Maxwell was charged and convicted in this case and as the court will recall, not getting into detail on the facts, but this was the drug stash house case where it was created, a fictional situation created by the government. At trial, the drug quantity was a material issue. Two things violated his right to a fair trial on that issue and tainted the jury's entire determination on this case. The first one was violation of his confrontation rights. That happened in two ways with respect to the admission of his co-defendant Alexander's statements against him and the other defendants. It happened as it relates to the inability or the limitation on the cross-examination of the agents regarding their decision to select eight to nine kilograms of cocaine as the quantity that was supposedly involved in this stash house. The determination was theirs. Defense counsel was precluded from impeaching their credibility on that determination as to why they selected that amount based upon their knowledge of Title 21 and that a higher penalty attaches. Wasn't the judge in kind of a tricky spot given the rule about not allowing argument about sentencing in a criminal trial? Absolutely not, Your Honor, and here's why. Because there's a difference. We were not attempting to invite the jury to consider what the potential sentences were. All we were trying to establish was... How could this information come out without the jury being able to figure out the very thing? Okay, fine, you might not have argued about it, but wouldn't they have in front of them that information? Simply by that question that aren't you aware, Agent Zayas, Agent Johnson, aren't you aware that the quantity of eight to nine kilograms of cocaine carries a higher penalty than less than five kilograms of cocaine? That's it. Yeah, but right there, the information's right in front of the jury. That was what we were precluded from asking. No, I understand that, but I'm just saying even that simple basic question puts in front of the jury the sentencing consequences of convictions. It might put the consequences that a sentence for five kilograms or more is higher, but it does not put in front of the jury what I think the rule is designed to protect against, the actual potential penalties. That, I think, is what the rule is designed to prohibit the jury from considering what the actual penalties, potential sentences are. Not that one level of drug quantity carries a higher penalty than... So if that's true, defense counsel, once that's in, should be allowed in closing to say there's a really big difference in terms of what you choose to do here, in terms of whether there's more or less than five kilograms. I think that would be going too far. Why? That would be going too far. Why? It's just more or less. I'm sticking with the more or less point. No, I think it would be going too far to argue directly to the jury that the purpose for which it's admitted could be argued, that the agent knew, and that's why the agent selected a quantity, that the penalty for this quantity is higher than less than five kilos. That's the point about that. The second part of it is, again, Alexander's statements, those are the two components of the confrontation argument. The other thing about... This is the Bruton point? The Bruton point. So explain the problem? The problem here is that this was a joint trial. Right, but what's the language you didn't like, and exactly how did it have to be substituted in respect to what actually was substituted? What happened here was there was testimony through the detective that Alexander stated in his post-arrest custodial statement that the agreement among the others, and they, had changed, and that they would be now... What would you have preferred it to say? I don't think that comes in... It comes in redaction. Alexander, and then what follows the end? I don't think you can redact it and to say his agreement with the others. He could say, I've changed my mind, and it was going to be up to me as to whether I was going to take the entire eight or nine kilos, or whether we were going to... Does it allow substitutions of others, or... There are, but not where the natural and inescapable inference is that it refers to the defendants who are sitting there on trial with the out-of-court declarant defendant. I mean, it's one inference, but it could be other people, couldn't it? Not in this context, and particularly so in this context, because Detective Hodes had just testified also, so here's another example. A statement that Sheem, Terrence, Justin, and Cash were the other individuals I was arrested with, and these were my brothers, and the plan was my brothers were going to go into a house and take all the narcotics. So, it's that, and combined with a second, and there's more instances, I think, Your Honor, that if you look through the record, that the statements of Alexander, which incriminate directly, incriminate his co-defendants, are admitted. And there's no, there is absolutely no curative instruction given here. I mean, is there a case that says in a conspiracy setting when you have a brutal problem, one person's statement is admitted, it's being used against the others, that even though it's a statement about doing something with other people, you have to, I guess, pretend for the sake of the jury that it was only one person? Because that seems misleading in the other direction. I'm not sure I follow the question, Your Honor. Well, I mean, it's misleading in the sense that it wasn't Alexander by himself. I mean, that's not accurate. It was Alexander and others, and so it's funny to... Well, actually... Go ahead. I think there was, it was brought out again on cross of Detective Hodes that Mr. Alexander was actually all over the place on this, and kind of backed off and said, well, yeah, it was actually, it was going to be up to me to decide whether it was going to be taken or not. So that's, you know, the jury hears... If it cannot be deleted appropriately, then they just can't use it. I agree with that, Your Honor, and I see that my time is up. Thank you. Thanks. Who's up next? Good morning. May it please the Court, my name is Jennifer Schwartz, and I represent Appellant Kali Alexander. There were far too many issues raised in the merit brief to address all of them in the short period of time that I have today. Counsel for some of the other appellants are discussing some of the joint issues, so I am going to focus on whether the district court erred in imposing its sentence on Mr. Alexander. With regard to the issues that I do not address here, I'll rest on my brief. I believe that the district court did err in two specific ways. The first is the court's refusal to consider a departure or a variance based on sentencing manipulation on the mistaken belief that she did not have the authority to grant a departure or variance on that ground. And the second error, I believe, was that there was no meaningful application of all of the 3553A factors. So if you look at the sentencing hearing, the district court opened the hearing with discussion of the objections that had been raised by defense counsel, which were failure to grant acceptance of responsibility, sentencing manipulation argument with regard to the quantity of the drugs, and the leadership enhancement. After the resolution of those objections, all of which were based on the nature and the circumstances of the offense, the district court did not make any changes to the sentencing hearing. Each side argued for its proposed sentence, and in doing so, the attorneys discussed many of the history and characteristics of the offender. Immediately after these statements by counsel, the court imposed judgment without any discussion of the things that had been said or how those factors impacted the sentence. There was no acknowledgment of Mr. Alexander as a person, no reference to the pre-sentence report or any of the things that it contained, nor to the fact that Mr. Alexander was a defendant. There was no acknowledgment of the defense counsel's argument regarding Mr. Alexander's history. Just to make sure I'm keeping the defendant straight, did the judge ask a BOSCQA question, and if so, how did you answer it, or how did the prior lawyer answer it? The judge did ask the BOSCQA question. I was not trial counsel, but trial counsel answered. He objected to the court's failure to address the sentencing manipulation issue. And how about the lack of authority point? He objected to her willingness to consider it. He didn't go into the reasons why she was unwilling to consider it. Just to make sure I'm getting it, the sentencing manipulation, this is the choice of the eight kilograms? Yes, the nine kilograms versus four and a half, which was one of the most hotly contested issues at the trial. How do you respond to this way of thinking about it? I mean, in any sting operation, this happens. It's like a bid. I mean, are you going to bid high with the risk that no one accepts the bid, or you bid low and you increase the odds of people being willing to do it? I mean, if the conspiracy had been to commit three murders versus one murder, if the sting is to commit three murders, of course the sentence is going to be a lot higher. And so whoever is doing the sting has to decide how they're going to do this. I mean, if you say you want it to be 50 murders, the odds are pretty high you're not going to find any takers. But it's sentencing manipulation all the same if someone takes the bid, says, yeah, let's do it. So I don't understand why the number of people that you're proposing to be knocked off in a sting that way is different from the amount of drugs you decide to get involved in a sting on the other side. Does that make sense? It does. And your question really goes to the substance of the sentencing manipulation argument, which I know that Claire Curtis is planning to address. I was focusing more on the procedural issue. But this Court has stated in prior opinions addressing sentencing manipulation that in many senses it's more applicable in a drug case with regard to the amount of quantity than it is in, say, a terrorism case or something like that. And I think that this case... Because the statutory penalties are tiered on the basis of quantity. That's correct. And I think this case fits pretty squarely within some things that were mentioned in United States v. Strickland where this Court refused to apply sentencing manipulation or sentencing enhancement but said, you know, we don't need to apply it here because the agents didn't predetermine the quantity and the type of the drug. They didn't suggest that weapons were necessary. All of which did happen in this case. I see that my time is up. Thank you. Your Honors, may it please the Court. My name is Jim McDonough. I'm the attorney for Terrence Chappell. And I would like to thank you for the indulgences that you granted me with respect to this argument in leaving. Thank you very much. You and I are the only ones happy this started at 8. Yes. 7 o'clock might have been better, Judge. So when we sat with all the lawyers, we agreed as to what we would argue. I wanted to argue sufficiency of the evidence as it relates to my client, Terrence Chappell. And I'm going to ask you, when I make this argument, to remember the words that you just said, takes the bid. The facts in this case, and my argument is going to be sort of fact-driven. That the ATF came to Cleveland with the idea to conduct stash house slash invasion robberies. ATF came, met with local people, developed two confidential informants. That confidential informant knew about an individual named Alexander. They then began, they, the government and the informants, began going to work as it relates to Alexander. They ultimately have some meetings with Alexander. And then on August 25th, there's a meeting between the ATF, the confidential reliable informant, and Alexander, all recorded. There's then on 8-27, a meeting with ATF, the informant, Alexander, and Nichols. Then on September 2nd, there's a meeting with ATF, the informant, Alexander, and Maxwell. My client's name has never come up to that point. Officer Zayas, when he testified, said he didn't know, never had heard of Terrence Chappell before the date of the actual incident, which was September 3rd. Before the four-minute discussion in the court. Correct. And interestingly, Zayas, when he was cross-examined, admitted that he likes to have numerous meetings with the individuals that he is targeting. So that they can have an opportunity to withdraw from the case. The plan agreement. So what the prosecutors have to prove under 21 U.S.C. 846 is an agreement that my client had knowledge, intent, and that he participated. So we can all agree prior to September 3rd, there's no evidence of Mr. Chappell at all. What evidence do we have as it relates to Mr. Chappell on 9-3? The defendants, along with an informant, are in a car for a 20-minute car ride. I believe that you actually have the video there. When you review the video, my client, I believe, is in the back seat, right-hand side, up against the window, playing with his phone the entire time. Says nothing. They go to then meet where they're going to get the robbery car. And that's when Zayas comes in for the first time, identifies my client, and says to all of them in four minutes what the robbery is. And he absolutely includes that it's eight or nine kilograms. He says all of that. Next thing they do, they drive the car to a prearranged place where they're all arrested. My client absolutely was in possession of a gun. There's no question about that. But what I ask is, what evidence specifically do they show that my client had an actual knowledge of what was going to happen? What evidence do they have in an agreement? And what did he do to participate other than mere presence? As you said, did he have an opportunity to take the bid? I guess he could have said no on the tape, that four-minute tape. Why does he have a gun? Well, certainly not for any good reason, that's for sure. But the question is, because you have a gun, doesn't mean that you're going to go conspire to sell drugs, which is an important distinction as it relates to my client. Do you want to say, based upon the four-minute conversation with Zayas, that he was going to rob somebody? That's one inference that you could draw, but you could also draw a lot of other inferences. But there certainly is no evidence that my client had any... They just didn't prove that he knew that it was going to be a robbery of a stash house with drugs. There simply isn't any evidence. And so as I was preparing for this last night, I looked at the government's brief. And when they addressed the facts as it relates to my client, from page 56 to 59, on nine separate occasions, they say, Zayas explained to Chappell the details of the robbery. Notably absent is the comma in the conspiracy to commit drugs, or to rob the place and then take the drugs and distribute. The next two sentences, Chappell questions Zayas about the robbery. He asks about the vehicles which would be used in the robbery, which is the one word my client said in that four minutes. It appeared that he uttered the word car. It was sort of unintelligible, but that was the only thing he said. That's the only act he did. They then said Chappell knew that the Zayas would provide the vehicles for the robbery. Next, suspects drove to the location where they were to obtain the robbery vehicle. That might be a subliminal slip, but how do they prove that my client knew that they were going to go rob a place, steal the drugs, and sell them? Thank you. I see my time's up. You've got clean up. Good morning. Yes, I do. Thank you. May it please the court, opposing counsel. My name is Claire Curtis, and on behalf of the Federal Public Defender, I represent Kenneth Flowers in this matter. I would like to start with Issue 3 and then back around to Issue 1. Certainly I'm willing to answer any questions the court may have on Mr. Flowers' second issue. Mr. Flowers is distinct from all of his co-defendants because he lacks any predisposition having no prior criminal record, and therefore the arguments I'll be making today are distinct. This court should join the majority of circuits in holding that sentencing manipulation is an available defense. There's been some confusion in the case law, both in this circuit and others, as to the distinction between sentencing manipulation and sentencing entrapment, but these are very different things. Mr. Flowers is specifically arguing that sentencing manipulation applies to him because in that situation, as identified by this court in United States v. Greer, this is improper governmental conduct that enhances a defendant's sentence. What's your response to the question I asked of your colleague? As to drug quantity, Your Honor? Yes, there are actually several concerns that this court needs to look at in considering sentencing manipulation in this case. The testimony at trial, which is very brief as to how the quantity was discerned, was that this was based on an average amount of drugs found in an average stash house in Cleveland. Now, when that statement by Agent Zias was challenged on cross, he did have to admit that there was no report on which he relied, there was no data on which he specifically relied or reviewed to make that assertion, and that this was, in fact, information that he'd been told by another agent who had been told by another agent. Now, the problem with that, when we think about due process and fairness, is that this is information, if it even exists or is accurate, it's invisible to all of us but law enforcement. It's not challengeable or subject to any meaningful adversarial testing by the defense. This is just a bald assertion. There's... Maybe you can just talk me off the ledge at this point. I'm wondering what the right answer is, even if it's crystal clear that the reason they picked eight kilograms was to get you over five. Let's just say that's just what the record shows. You know, if you commit two murders, everyone knows you're going to get a much bigger sentence than one murder. And if it's five, the same thing. So drugs, it's just the same. So I guess I'm trying to figure out how that works. I mean, the risk, from the officer's perspective, is the more outrageous the crime, the more significant it is, the more laws it violates, the greater the possibility people aren't going to accept the offer to join the conspiracy. So I'm just not sure I'm understanding how that works, separate and apart from why these officers picked that amount. I believe I can answer your question. There are two components to that answer. First is that other circuits have been very critical, in Mr. Flower's opinion, rightly so, of that practice because of the way the sentencing guidelines operate as to drug quantity. It gives the government an incredible amount of power to, I believe the Eighth Circuit's term is, artificially inflate the sentence of any defendant. And that should be a concern to this court and any court. In addition to that, it absolutely... Why are murders different? I mean, isn't a murder lead to a higher sentence than drug distribution? So it seems like the stakes are even higher. Well, tell me this. If you had a sting-type situation and the conspiracy was to knock three people off, would you say sentencing manipulation? I mean, it's always fictional. It's a sting, right? So everything is fictional here. They pick three as opposed to one. That's sentencing manipulation. Your Honor, the issue here is not the fact that drugs are involved. The issue is how the guidelines operate with the fictional information that's being provided. I'm sure the guidelines are not happy with three murders. I imagine not, and certainly a sentencing manipulation argument could be made in that case as well. It's the same in both. And the concern is that it takes sentencing discretion away from the district court, not only because of the guidelines, but because there is a statutory mandatory minimum that the district court is required to impose under 841. In my case, the district court even acknowledged, gosh, Mr. Flower says no predisposition. I'm really surprised the government isn't asking for a lower sentence here, but my hands are tied. The statute requires that I impose a mandatory minimum sentence of 10 years, regardless of what other information you might be able to tell me about your client. And taking away that discretion really nullifies any ability that the sentencing court has. It's the same thing that's true with using guns in crimes, right? There are mandatory minimums with guns in crimes, right? Yes, and the distinction here is the difference between the possession of an actual firearm. We're certainly not challenging the consecutive 60 months Mr. Flowers received for possessing a firearm. But now we have a fictitious amount of drugs that, again, is just an attenuated amount that's not being supported sufficiently by evidence that is literally binding the district court from making any discretionary decision about the appropriate sentence. And this court should be distressed by that. And the majority of circuits are distressed. I think a number of courts are. The question becomes, what does one who is distressed by this hang their hat on to say this is an impropriety that cannot be allowed? There has to be some basis for the amount. That's some basis that's supported by the evidence. For example, in a Ninth Circuit case called United States v. Hullabye, which is cited in the government's briefing, in that case the agent said we knew based on our experience of prosecuting drug cases that we needed to include this amount to get the kind of interest from the people that we were targeting. We knew that based on dealing with these people and dealing with the drug community. So the Ninth Circuit said that's sufficient. You've created a basis for how that amount came to pass. Here we don't have that. There's been nothing provided that supports that amount in any challengeable or meaningful way. Even if this Court isn't prepared to say that sentencing manipulation should have been applied in Mr. Flower's case, certainly this Court is poised and should join the majority of circuits and say sentencing manipulation is an available defense and then remand to the district court and allow the district court to make a determination about whether it should have been applied in Mr. Flower's case. Because all we have in the record here is that the judge says, gee, she literally says my hands are tied. I'm unable to make a determination about sentencing manipulation. So if the Court is not prepared to make that kind of assessment, certainly this Court should join the majority of circuits and say this is an available defense. Let's send it back to the district court and let Judge Gaughan make that determination. Additionally, I ask that this Court join the Fifth and D.C. Circuits in recognizing the doctrine of indirect entrapment as it relates to Mr. Flower's. This Court has already acknowledged in United States v. McLernon that indirect entrapment is out there if one of two possible exceptions apply. Specifically, what I'm asking this Court to do is apply the first exception, which is for third-party agency. Now, what this Court identified in McLernon is that when an individual acting as an agent of the government induces someone to participate in this kind of conspiracy, then indirect entrapment is available. Now, what this Court has never ruled on, and which remains an open question in this circuit, is whether or not there is a knowledge requirement for that third-party actor. Now, the Fifth Circuit in United States v. Jones said that there's no knowledge requirement, because really the outcome is the same. The terminology that the Jones Court uses is ignorant pawn. So whether an individual is acting intentionally at the behest of the government or unwittingly as a government actor, the result is the same, which is that the person is induced. In Mr. Flower's case, as I've previously noted, he had no predisposition. The trial court already made that factual determination. And when he raised this issue in the motion to dismiss, the trial court said, well, but he wasn't directly targeted, so I can't grant your motion to dismiss. But the indirect entrapment doctrine does apply to him and should have been applied. The only clarification that this Court need make is ask the degree of knowledge that's required by the third-party actor. And there's no need for a knowledge requirement, because again, the practical reality is the inducement is the same, regardless. If there are no further questions, I see my time is nearly up, and I'll reserve it for the Bible. All right, thank you. Thank you, Your Honor. Mr. Ranke. May it please the Court. My name is Dan Ranke. I represent the government in this appeal. I think I would like to start with a brutal issue in this case. The Court or the government here did really exactly what's required to introduce these type of statements. They redacted any reference to the co-defendants. They used neutral they or others to discuss their involvement. There's no magic deletion methodology that has been approved as the way this works, correct? Because under our law, the question is whether it clearly implicates these defendants. So each case we're looking at on an individual basis. So you've had testimony in this case of who the others are. They're named as the other defendants in the case. And then the statement is made that I and the others, all of whom are sitting across the front row in the courtroom, who else could it be? Why isn't that not a clear implication of these defendants? It's not clear as to first who, which defendants. There's four people other than Alexander sitting there. It's not clear which defendant they or others could be. It's not necessarily all of them. It could be one. It could be more. It's also the problem in the past is when, as in Gray, they would use like, they would say deleted. Or they would put like an asterisk. And it would just go, and you read the statement. You could count the deleted. And it was obvious that Bell was talking about Gray in the confession in that case. But why is it not here if others have already been defined? They are in the parties charged. They're before the court. They're all sitting there and are called the others, Alexander and the others. Well, because you don't know which others. I mean, there's more than that. It's not just in Gray and even in Bruton and Richardson. There's two defendants in all those cases. There's the person making the statement, and then there's the defendant. So then it's fairly obvious at that point who you're talking about. What's wrong with just not saying you weren't talking? It isn't anyone else. Just Alexander says X. It's not really. Well, that's not really what the statement said. The statement was not just that it was Alexander, that it was that they had all decided that they were going to cut out the Zayas. That's not the question. It wouldn't be. The question is what you may do, not what you did do. So the question is whether you have to, in that circumstance, let Mr. Alexander's testimony be what is used, or you violate the Confrontation Clause. If you make the clear implication that the others are all those other defendants that are involved in this very case. It's not really the clear implication that all of them are involved in that decision. Well, when, under your analysis, would it ever be? If there were less, in these other cases, if there were only two people. It's factually, as you said, it depends on the facts of each case. And if there's only two defendants sitting there. So if you had Alexander says, we did it and there's only one other person, then that's clear and there's a confrontation problem. But any time you get more than one other defendant, it's too bad? Because it could be some and it could not be others? That would be an odd line to draw on a constitutional basis, that it depends on whether you're two defendants or three or more? Well, not necessarily because really what you're looking at is who's implicated here. And you don't know who's implicated because of the redactions. It doesn't, they or others can mean other things. It doesn't necessarily mean those four people other than Alexander. Even in Gray, the Supreme Court, for an example, said, you know, the Gray said me and deleted, deleted and a few other guys participated in the beating, which ended up in the person's death. The Supreme Court said, why couldn't they just say me and a few other guys? As that was okay to say that as part of the redaction. That's really exactly what we did here, what the government did here. It didn't say Alexander, it didn't say me, and then deleted, deleted, deleted, deleted all four defendants. We tried to make it as neutral as possible. Ms. Pennelly also criticized the failure to give a curative instruction to the jury. Do you have any comments on that? Ms. Pennelly is correct in that there wasn't a curative instruction. In Brewton, there was an instruction in other courts where the court said, you can only use this statement against Alexander. We don't have that here. It was discussed in pretrial motions. It was discussed in the government's omnibus response to the defendant's pretrial motions for this issue. It was, I think, even anticipated. The instruction wasn't asked for by any of the parties and it wasn't given. There was a general instruction, but it doesn't rise to the level of the Brewton instruction. I don't know why. It was anticipated and it was discussed. Is there a strategic reason for not asking? It could be. It could be. I'd like to move on to the sentencing manipulation argument if there are no further questions on Brewton. Are you going to address the prosecutorial misconduct? Okay. Prosecutorial misconduct, there was really three. This occurred in the government's rebuttal close. There were three instances where the defendants claimed that the government argument remarks were improper. Probably the most significant one is where the government said that if you consider this 4 to 4.5 kilograms of cocaine, then you're being asked to violate your oath. Why isn't that misconduct? The government was commenting on the fact, and this can be shown by later on in an argument where the government read the jury instruction about that the amount of the cocaine doesn't matter as to their guilt for the conspiracy. It only matters as to the possible sentence. The guilt is unaffected by the amount, whether it's 8 to 9 or 4 to 4.5. The elements really are manufacture, distribute, or possess with intent to distribute a controlled substance under 846. It doesn't say how much. The amount comes in under 960, which would raise the mandatory minimum sentence. The government was really just trying to remind the jury that they were going to be instructed, and that was the law, and that was the evidence. And just reminding the jury that that was their obligation to listen to that. And that's why the government then read that jury instruction into the record on page 5699, where they said this is the jury instruction you're going to receive, and then read it verbatim. And then concludes with every time it's suggested that you consider 4 kilograms of cocaine, you were invited to violate your oath. Repeated only in rebuttal. The last thing the jury hears before they go, repeated how many times? Three times. Along with other statements about you're not allowed to consider this. Tell me why that's not flagrant. Because what the government was trying to point out was that that was an improper argument as to their guilt for the conspiracy. And that considering the amount of the drugs was not under 846, the amount of the drugs didn't matter. And so by asking that, you know, the amount of the drugs matter a lot in the trial, obviously, because it affected the sentencing. And the defense counsel all knew that. Defense counsel fought that issue for good reason. I mean, if the special verdict form to the second count dealt with the amount of the drugs, and if they could have found that it was less than 5, it would drastically affect their sentence. That's why it was, you know, obviously this court knows, that's why it was contested. But to argue that somehow the defendants were not guilty because it was four or four and a half, that was an improper argument. And that's really what the government was trying to get to with this. Now, could it have been said better? Absolutely. Was it inartful? Yes. But it wasn't misconduct. I've looked for cases on this. The whole argument was irrelevant. It's not just that it was irrelevant to the question of whether you're guilty for the underlying conspiracy. It was actually irrelevant to the drug amount they were going to put on the special verdict form. Because in a conspiracy, it doesn't matter who gets what. It's that the whole conspiracy was designed to get eight plus kilograms. That's another point, Your Honor, is that all the defendants are liable for the whole amount. Yeah, there is no such thing as dividing it up and splitting it. I'm responsible for two. You're responsible for two. You're stuck with the aim of the conspiracy, which is what strengthens their sentencing manipulation point. But if that's true, the premise of that is true, then they really were making an improper argument, the defense were, in saying you could only be held responsible for four because they were going to give four back. That doesn't make any sense under conspiracy law. Well, and that's somewhat what the government was trying to get to with what they were saying. There's two other statements. One where the government says that she's there to correct the record because there were misstatements. If you look at what follows that, again, the government is just talking about this theme that somehow ATF had done something wrong in this case. That ATF was on trial and that the fact that this was a fictitious stash house, fictitious drugs, was somehow improper. And that the defendants weren't as culpable because it wasn't real drugs in a real stash house. Well, isn't that some of the concern that several courts have addressed, that it isn't real, that it is a creation of a crime? I think all of us would recognize that there is concern about the way these stings have been used across the nation. I will confess that I have some concerns about that. It's a struggle to understand why in a country in which there is plenty of crime to investigate, we are instead creating criminal situations. And evidently, perhaps enforcing these in a way that's racially discriminatory. Were all of the defendants in this case African American? I believe they were. Isn't there, what is your response to the recently filed litigation that suggests that the stash houses across the nation are employed in a racially discriminatory manner? I think the one in Chicago filed said that 91% of all of the stash houses in that area were either African American or Hispanic defendants. There's no indication that the government or the ATF focused this investigation because of any improper motive. The testimony, Zayas' testimony, and Zayas has been involved in a lot of these cases. One thing you see when you do research on these drug stash house cases is Zayas has been involved in a lot of them as the agent. And does the government keep statistics on how many of the nationwide stash houses that are created address African American or Hispanic defendants? My office does not. I don't know about Washington, D.C. My office does not. Because it doesn't affect in other places. We're only interested really in the northern district of Ohio. But there's no indication that anything was based on an improper motive. Zayas testified that the ATF came up with this sting in direct response to an increase in home invasion robberies and drug stash house robberies. And it wasn't... He testified, did he provide any background information for that? Because I thought the response to that was that there is very little statistical evidence of stash house robberies. And you and I know why. Because the guy who has the stash house is not going to go to the police and complain that somebody robbed my stash house. So in fact, that is an invisible crime, isn't it? To a certain extent, yes. And that's why it's an inviting target for people. Because they realize they think they can go in there and that there won't be consequences with law enforcement. And that everyone tries to just take care of it themselves. And that's one of the reasons... There was no testimony here about ATF statistics and how they reached their conclusion. There was just testimony that this reverse stash house was started. This whole sting was started in response to their information that these robberies were becoming a problem. And that they were such violent, by their very nature so violent, that the community was put in danger by them. If we get into the sentencing manipulation argument. Well, first this circuit doesn't recognize sentencing manipulation. Is this circuit bar? No, it does not. Basically we have McGee, the United States v. McGee, which is a case that's cited in my brief. Just talks it doesn't recognize it. United States v. Hamadi, which I think I'm pronouncing that right. Discusses the concept, but finds that it doesn't apply. Hamadi was a terrorism case out of Bowling Green, Kentucky, where they were funding terrorism and then actually providing weapons. And the defendant ended up with a life sentence because of an agreement to provide service to air missiles. And the court found that Hamadi didn't qualify under either one, so it didn't really come to a conclusion as to whether the circuit should recognize sentencing manipulation or not. And what is your response then to your opposing counsel's argument that you have a situation where the government comes in without statistical or other information regarding why they selected the amount of drugs that were selected? They contacted, used informants to bring people in from the community, primarily I think in this case, people who have been released from prison and are not back on their feet. So they have a group that is attracted to this kind of a crime or a created crime. They ensure that guns will be there by telling them there's a guard there and the guard has weapons and I'll get you a car to take you there. Why is this not outrageous conduct on the part of the government? We're really talking about both sentencing manipulation and outrageous conduct. You can separate them. I'm fine with that. Separate your responses because it seems to me there's such an interrelationship. No, they are interrelated. I think the outrageous government conduct must shock the conscience or offend canons of decency. That's basically what the case law says for outrageous government conduct. Then look at sentence manipulation, which is perhaps easier to address. First we have testimony from the agent as to why the amount was chosen. Local law enforcement told him that was a typical amount. It would be a believable amount for anyone they were proposing this to. Secondly, the government didn't pick this group of people. The government approached Alexander because they knew he had a prior aggravated robbery conviction and that a confidential informant had dealt with him about purchasing weapons and selling drugs. So they went with Alexander, who sold them heroin, and then at that first meeting proposed this stash house robbery. The government just proposed the robbery. The government did say there would be an armed guard. Absolutely. And the government did say the amount of the drugs. But Zayas testified that the armed guard was just to emphasize that this was not going to be without risk. And that the defendant, if he was going to be involved, should know what the risk is. And that's why he focused on that there was an armed guard. Because he said they had people that came with hammers, knives, bricks. You didn't necessarily... Yes, that's what he testified. Because they use the same scenario in all these cases. Slingshots? He didn't say slingshots. But they use the same scenario in all these cases. And other courts that have looked at, even the courts that recognize sentencing manipulation, have looked at this and found that much higher amounts of cocaine were not somehow manipulating the sentence. But you don't dispute that the government is completely in control of the fiction that they're creating? They're in control of the suggestion of what's going to happen. But after that, it's up to the defendant. Oh, they're in control of the amount. Yes. Which is what drives the sentence. It does drive the sentence. But 8 to 9 kilograms isn't... Like I said, other courts have found 30 to 40 kilograms, 22 to 39 kilograms, 10 to 15 kilograms, 40 kilograms. Depending on where you are. Glendale, Arizona, 22 to 39 kilograms was a typical amount. Tucson, Arizona, 40 to 50 kilograms was a typical amount. Prince George's County, which is a neighboring district of Columbia, 10 to 15 kilograms. No court has found that the government setting that amount was somehow improper. Courts have expressed a concern that the government is setting the amount, but no one has... The courts have not found really that that amounts to improper sentencing manipulation. As long as there's some indication as to why they set the amount. And here we do have that testimony. And so the evidence that's necessary to justify it is the agent who goes all over the nation and chooses the amount. And he chose it here without any statistical or testing analysis or any documents in the record that support his testimony. And your position is that sufficient? We don't have any documents in the record. We just have his testimony. That's what he was told was an amount that would be believable and by inference enough to make it worthwhile. And the person who told him that was not called to testify, correct? Yes. On the sentencing manipulation argument, Ms. Schwartz points out that the judge believes she had no authority to consider sentencing manipulation as a part of her decision-making process on the sentence. The Supreme Court has said that district judges are free to disregard or to disagree with the guidelines in imposing a sentence. If a judge can disregard or disagree with the, not disregard, I'm sorry, but disagree with the guidelines as it relates to a certain offense, how in the world would the judge lack authority to consider sentencing manipulation as a factor? Well, the Court just mostly focused on the fact that the Sixth Circuit hasn't recognized it. And you're right, the Supreme Court has said that the district court can disagree with the guidelines on policy grounds. Mostly that relates to child pornography cases. They've done it a lot. That seems to be an issue where it's raised mostly. But here you also have, because it's over five, it's the mandatory sentence. The Court can't just ignore that. Yeah. Can you just remind me for Alexander where the sentence was in relation to the mandatory minimum? Was it above it? I'm sorry? Well, your last point is that this doesn't matter if the sentence reflects a statutory mandatory minimum, right? So I'm asking to be reminded with respect to Alexander, was the sentence over the mandatory minimum? Was there some discretion here? I'm trying to figure that out. Well, let's see. He got 120 for the conspiracy and 60 for the gun, consecutive. That's all required by Congress. Right. Was it more than 180? Yes, it was. 200, was it 211? I'm just trying to figure out your response to Judge Stee's question. I mean, because the question's a good question. If there was 355-3A discretion, but, you know, it doesn't make a difference if there wasn't. So I'm just trying to figure that out. But, I mean, obviously it's not hard for me to go back and look. But I just wondered if you were going to answer both points or you didn't have to answer both points. I can't remember what the specific sentence was. I'm sorry. Okay. I think it was over. It was 200. All right. Well, let's assume that there was discretion here, kind of a typical 355-3A discretion. It's true district court judges are allowed to disagree with the guidelines and guideline recommendations. Is this of the same kind or is it not of the same kind? I don't think it is of the same kind because the court, again, felt it was bound by this court's precedent. Well, yeah, but I mean, the reason he's asking you the question is whether we should recognize sentencing manipulation so that she realizes she has this discretion and can do something about it. So that's not really an answer. Because the court, in response to Judge Stranch, you said the court has never, our court has never said that's categorically prohibited. We just haven't said, we're just silent on it. And when we're silent on it, that makes this case important. It makes your argument important. Okay, so you're not helping here. Well, he was, ultimately I think Alexander, I'm just trying to think, I'm trying to figure out how to answer your question. Well, that's fine. You might ask Ms. Schwartz what the sentence was. What was the sentence? I thought it was 200. So it was over the mandatory minimums. Yes, it was. And so the premise of Judge Dee's question does apply to Alexander. And so that means the question is, it's highly relevant whether we recognize sentencing manipulation as an explanation for exercising sentencing discretion. Right, but this court, the case law doesn't say that this is sentencing manipulation, even if this court recognizes the concept of sentencing manipulation. And the reason you would say that is, in this particular case, the facts show that there wasn't any evil design to this. The facts show that the number was picked for innocent reasons, is your point. I'm sorry, yes. But yes, even if this court in this case said, okay, from now on the Sixth Circuit is going to recognize sentencing manipulation, it doesn't apply here to make any difference in their sentence, because this wasn't manipulation. There was no indication that they had eight to nine kilograms to raise the sentence. The testimony was the opposite, that this was a typical amount for this area, for Cleveland, Ohio. For all the defendants in this litigation, or are you only speaking of Mr. Alexander? All of them. Including Flowers? Yes. So just to make sure I'm understanding something, this will, I guess, be eventually for Ms. Schwartz, but maybe you know the answer. I thought the sentencing manipulation argument was mainly about manipulating the mandatory minimums. I didn't realize it related to other discretion, but maybe I'm wrong about that. I guess the way Ms. Schwartz argued it, she was saying Judge Gaunt thought her hands were tied, even when it came to dealing with what's over the mandatory minimum. She did say that. She was referring to her hands being tied about in which direction, going below the mandatory minimum or anything over it. I believe going below. Okay. Well, we'll see what Ms. Schwartz says about that. Well, if there are no further questions... All right. Thank you very much. There was a lot here on this one. So thank you. All right. Who do we have first here? Ms. Pantanelli? Yes. Thank you, Your Honor. I just briefly would like to address the prosecutorial misconduct. Mr. Reinke mentioned that there were... Violate your oath point? Absolutely. There were other comments as well. And whether it's plain air or harmless air, how is it either if the reality is that you're stuck with the amount of the conspiracy? Well, that's exactly what I wanted to get at, Your Honor, and it was your comment that prompts this. Judge Gaunt permitted the parties in this case to argue to the jury a lesser amount. In fact, the jury had to decide. It's an element of the offense, the quantity determination. It's an element of the offense that the jury does have to decide, and the government has to prove beyond a reasonable doubt. Obviously, the defense has the ability to argue that it is... Just to be clear, I'm not disagreeing with that. I'm saying I thought the theory was the way you get below five was to say, well, eight was going to be here, then the government was going to give back four or keep four, and so that was how you got below five. I'm just saying that's an incoherent theory of conspiracy law. Well, that's... I don't... I disagree with that, but I also disagree that that is a decision that the government can get on a directed verdict. There's no directed verdict on it. It's for the jury to determine what the conspiracy was, who the participants are, and what the scope of that conspiracy is. In this case, you have the government saying it's eight to nine kilos in the house. But on every occasion, the government agent bargains with these defendants that we're going to split it half and half. He's going to be there in the house at the time of the robbery. He's going to be down on the floor, and he himself testified at trial. It was then, at that point, once we're in, once we get in and get cleared, at that point, we are going to steal the cocaine. He actually testifies... Which case says that if you plan to split the amount, that drops the amount of cocaine or drugs that are the object of the conspiracy? Is there a case that says that? No, Your Honor, and what I'm suggesting is a little bit different. This is, what was the conspiracy among these defendants? And their conspiracy, if anything, was to... that they were stood to obtain at most half of the eight to nine kilos. But the core of your argument is that it is the jury who sets the amount that is in the conspiracy. And they did that by special verdict here. And you had a right to argue that to the jury. And in the face of that, in rebuttal argument, the government consistently says, if you consider four grams of cocaine, you're invited to violate your oath. That's exactly right. And it's my position that we have the right to, as a due process right, to make those arguments to the jury, and that the government cannot then come in, undercut those arguments simply by saying to the jury... They could say they were wrong. It's the way they said it. They're obviously allowed to say, that's a mistake and here's why. Well, what the problem is, is how it was done in this case. By both the prosecutorial misconduct, in this case, and by the... the Bruton issue goes right back into the very heart of that defense as well. Because if you remember on the Bruton issue, it's Alexander saying, we had changed, the agreement had changed. We weren't now going to split the cocaine with Zayas, so it's not going to be us five to have four to four and a half. We decided that we're going to take all of it down. That was the improper Bruton statement that came in as well. So it goes to... both of those constitutional violations go directly to the heart of the quantity determination that was... We got it. For the jury. Thank you. I see my time is up. Thank you. So as was, I think, settled earlier, Mr. Alexander's sentence was 211 months, which was above the mandatory minimums. And that was one of the reasons that his counsel wanted the judge to consider a sentencing manipulation argument. And just to be clear, it was sentencing manipulation in terms of discretion above the 180, or it was sentencing manipulation as to a reason to go below the 180? Well, I don't think that was ever spelled out because the judge just refused. She felt that she didn't have the discretion to even consider the argument at all, so there was never any discussion of whether it was above or below. I think... But they're very different arguments. They are different arguments, but they're ones that there was no opportunity to make because the judge just shut it down so quickly because she felt that she had no discretion. I think that she did have. No, but I mean, you just heard Judge Stee explain the argument. Your Honor, this is different. There are two different things here. I realize it's asking a little more to have sentencing manipulation give a judge permission to go below the mandatory minimums. That's distinct from how far above 180 you go, and I think you ought to consider what the government did here in deciding how much, if any, to go above 180. And that argument wasn't raised. The government refused to consider sentencing manipulation in any form. I'm sorry, the judge. And when she was imposing sentence, she really didn't even address any of the personal history or characteristics of the offender, which is another issue that I raised. I mean, she focused solely on the offense itself. Gall v. United States instructs that a sentencing judge is supposed to treat every convicted defendant as an individual, and I think that the district court judge really failed to do that here. Everything, she said very little in imposing sentence, and what she did say spoke only to the offense. Just one question, just to make sure I'm even figuring out how this argument works. How is it sentencing, quote, manipulation to do something that could affect how high above mandatory minimums someone goes? It just doesn't compute in my head. Sentencing manipulation makes sense because it's tied to mandatory minimums. That's what makes it a sensible and arguably powerful argument. But I don't understand how it applies to discretion. Well, the way the guidelines work with the quantity, the amount affects the guideline range. And so obviously I think it's most impactful with regard to the mandatory minimums, but it does impact the ultimate sentence in ways other than the mandatory minimums, and therefore it applies in both circumstances. Okay. Thank you. Your Honor, Claire Curtis on behalf of Mr. Flowers. To address the concern that I think Justice Sutton is articulating, excuse me, Judge Sutton, give me a little upgrade there, Your Honor. Judge Sutton. I'll use General Curtis. I prefer it. It's a good deal. Thank you. I appreciate the upgrade. I'll let my boss know. In terms of you were asking about what about enhancements for murder, I think there's some concern from the bench that if we apply sentencing manipulation, then more severe conduct will not be punished more severely. And that's simply not the case. The point that Mr. Flowers is making, the very point, the very reason why sentencing manipulation is so important here is because the district court should have the discretion to look at each individual defendant, to look at their conduct, and to determine if a more severe sentence or a less severe sentence is appropriate. And here, the reason it's such a due process violation is because we have a judge who is recognizing my client as someone with no predisposition, someone who's distinct from everybody else involved in this case, but is entirely unable to exercise her discretion because of a decision that law enforcement made long before the case was indicted about what quantity they would include in this fake scenario. A majority of the circuits, as we've talked about, have already acknowledged that this is an available defense. I believe that the Eighth Circuit specifically says that this has a terrifying capacity for government to decide how much time someone should be given. The Eleventh Circuit is also incredibly critical of the dangers that this has brought. I know Judge Stranch noted the recent University of Chicago report. There is a 2016 report by the investigator general that also criticizes these cases. And I believe there are news articles about a recent decision by the Department of Justice not to litigate some of these stash house cases in Chicago because they have been so consistently criticized. Mr. Flowers also points out the wave of legal academia's criticism of these cases. And that's not to say that Mr. Flowers' case is open and shut, but there should be the availability and I see that my times may have just briefly concluded. There should be the availability of sentencing manipulation specifically in this case because the facts do support that defense. Do you care about it in terms of whether it's about mandatory minimums or discretion? Your Honor, I do believe this is a question of mandatory minimums. When this Court reviews the majority of circuits, they are criticizing mandatory minimums. Which does relate, of course, to the District Court's discretion because they are bound by those statutory minimums. In terms of discretion to go below the mandatory minimums as opposed to discretion to go above. Yes, Your Honor. That's accurate. Thank you. All right. Thanks to all of you. Thank you, Ms. Curtis and Mr. Ranke for your helpful arguments. And I see Ms. Schwartz and Ms. Pettinelli that you're court-appointed. I know Mr. McDonald was as well. We're really grateful for that. I did a little of this when I was in practice and I know how you're compensated, which is not well. So thank you. It's a real service to your clients and to the system. So I appreciate it. Thank you to all. The case will be submitted. The clerk may call the next case.